We are now going to move to our last case for today. Reconstitute the court. Judge Luck, are you with us? I am. Good morning, everybody. Good morning. Okay. Independent Party of Florida versus Secretary of State. Mr. Truden? Yes, Your Honors. Thank you very much. Daniel Troyden, appearing for the Independent Party of Florida and the Party for Socialism and Liberation. I wanted to start with the court's order of July 24th, just noting that we should be prepared to talk about standing under Article 3 and directing our attention to Bernbeck v. Gale in the 8th Circuit case. I believe that we do have standing, and Bernbeck can be distinguished on a couple of key facts. And also, the Supreme Court in Williams v. Rhodes, I think, talks specifically to standing in the instance when a party, like my clients, haven't circulated petitions for ballot access. In Bernbeck, that was an initiative case, not an election law case. And in the first paragraph of footnote 4, which is the long paragraph that the majority opinion of Bernbeck distinguishes the dissent, and they pointed out in that paragraph that the dissent relies on cases centered on a violation of a fundamental right to vote. And then it goes on to point out that the initiative petition process established by the state is not a fundamental right, but rather a non-fundamental state law right. And it concludes that paragraph by saying, we have yet to find a case involving that right, speaking of a non-fundamental right, where the state did not first enforce the challenged restriction. And then in the main opinion on page 648, regarding the circulation of petitions and the lack thereof for Bernbeck, it said in here, this is not a situation where an attempt to comply with the challenged requirement would have been futile. And so they concluded there was no risk that they were going to have signatures being unequally valued under their signature distribution requirement, because they had never even tried to get those signatures in the rural counties. When I read the statute as well, there was a 7% requirement to do initiative petitions for a state law change. And then for a constitutional change, you needed 10% of the signatures. And then it did have to be distributed among at least 40% of the counties. And he was arguing that there... Yeah, Mr. Bernbeck, yeah, it seemed to me that your case is pretty different, because the Party for Socialism and Liberation has chosen its candidate for president, and wants that candidate on the ballot in the upcoming presidential election. And it can't qualify at present, under either of the provisions of Florida law. Isn't that right? That is correct. And regarding... So it has an injury that's traceable to the law. Yes, yes, they do. And the independent party has not... Here's the problem I have with your case. This court decades ago, upheld in Libertarian Party of Florida versus Florida, a law that required minor parties to submit a petition signed by 3% of registered voters to access the ballot in statewide elections. But the new law, the law that currently applies, makes it easier for minor parties to gain access to the ballot, because they can qualify by either satisfying a 1% signature requirement, a less onerous requirement, or by affiliating with a qualified national party. So it seems to me, you have no substantial likelihood of success here in the face of that controlling precedent. Well, I just disagree in one sense, because most minor parties in the state are affiliated with a national party that is a national committee. The problem with that, though, is that there's no correlation of support within Florida to show that those parties have the sufficient modicum of support in Florida. And I haven't come across any... The problem with that is that, I mean, look, states have less of an interest, do they not, in the ballot access requirements for presidential elections? The Supreme Court has said that those elections implicate a unique national interest, because they're decided by the voters from the entire nation. So recognizing that, Florida has made it easier by recognizing there should be an additional method for ballot access for minor parties whose presidential candidates have national support. Yeah, but still, this is a Florida election to elect Florida ballot access or Florida electors. And just because someone might have a substantial support on the West Coast doesn't mean that they're furthering the state interest in reducing ballot confusion by putting someone on the ballot who may not have any support in Florida. That's why we don't see any cases out there that where the state before today has relied on national support for Florida ballot. And that's the issue that we have. These Florida minor parties that are affiliated and they show some level of support, although we contest that if you read through our experts deposition, or declaration, not deposition, at document nine, they go into a, he discussed how the getting FEC support is not necessarily have any straight correlation to showing support in Florida. And the council, this is Robert Love, there doesn't need to be that kind of fit between the goal or the interest that the state is asserting, the one that Chief Judge Breyer just discussed with you, and what actually happens. Our law has never imposed that sort of requirement in Anderson-Burda cases, has it? No, I just, I mean, this is a novel idea to take support from outside of the state and use that as support to, as a basis to add someone to the ballot. But it is a novel idea, or at least it may be a novel idea, but isn't it fully supported by exactly the case law that you cite, and that Chief Judge Breyer just discussed with you, and that is that a state has less of a state interest in presidential elections. And so linking support to national support, you know, under the rough rubric of having FEC, having qualified under the FEC regulations and statutes, fits in with exactly that sort of lesser interest, a lesser state interest, a greater national interest, doesn't it? Well, I think that the disparate effect of the two, whether you associate or not associate, I mean, that's a First Amendment right. And so when I look at, for example, 11th Circuit in Leeb, which I cited in my brief, when legislation classifies people in such a way that they receive different treatment under the law, the degree of scrutiny, the court applies, depends on the basis of the classification. And so if a court, if the law treats people differently on the basis of race or another suspect classification, or if the law impinges on a fundamental right... The counsel, isn't the problem, though, that may be true in the abstract on a freedom of association or an equal protection claim, but that under Anderson and Burdick, the Supreme Court has explicitly told us that these sorts of freedom of association and right to vote claims under the 14th and First Amendment are specifically to be analyzed under the balancing framework. Yeah, yeah, it is under the balancing framework. But I just don't see the logical nexus. Ballot access in Florida, I mean, the crux of our argument, and if the panel doesn't buy it, then I think we're going to lose. But it's the crux of the argument is that even though they have less of an interest in national elections, that statement was put in there to make it more and in this situation... And they've made it easier. Well, they've made it easier only if you associate with the right people, not if you... But doesn't your argument of another problem, and that is the trial court's findings here. Here, the trial court made findings after reviewing all the evidence that this is not a severe restriction. Specifically, the trial court found, and I'm looking at documentary 39 at page 12, that national parties... I'm sorry, that 10 minor parties have been on the ballot in 2012, four were on the ballot in 2016 by the affiliation method, and that in 1996, two minor parties accessed through the signature method requirement, the same 1% that's in here, and that in 2010, a candidate for the U.S. Senate also did so. So given that there's been a plethora of minor parties that have been there both through the affiliation method and the signature method, how can we say that this is a severe restriction that sort of calcifies the status quo such that it's knocking out minor and third parties? I believe that the... I believe that for the minor political parties, I believe the to get on the ballot, not parties that have gone by the signature method. Now... So you're saying that the trial court's finding is clearly erroneous? Because the trial court did find that in 1996, two minor parties accessed through the signature method, and in 2010, we have record evidence that a candidate for U.S. Senate accessed, which would be statewide, of course, and national. Yeah, I see what you're saying there. No, with those older methods with the 1% signature requirement was met, but it was met at a much lower amount, approximately half of what the signatures required are. But that's only a product of the fact that there's just less people in the state. I mean, that doesn't change the severity. Right. Well, I believe that the number of signatures that you have to collect is an severe burden or could be a severe burden in and of itself, other than the fact that... We've held that the 3% requirement, which even despite the population differences, meant that you had to collect more signatures than under the current 1% requirement. Yeah, and I also agree that the Supreme Court in Genes has okayed 5% in the past. But when you compare that with the various methods, if you compare the entire statutory schema in context, and you look at how if you associate with the right person outside of or right group outside of the state, then you don't have to show any state of Florida support. I'm having trouble understanding how adding a method to get on a ballot makes it worse for the state. It seems odd to me that the state would lower the threshold and add another avenue, and that somehow makes it more difficult in the state's interest, makes it more severe for you on your ballot side, and makes the state's interest less so on its ballot. Well, by passing a law that allows someone who affiliates outside of the state with a larger party outside of the state, they basically made a public policy decision that we don't necessarily need to measure the in-state modicum of support that exists for the other minor parties. Why does that make a difference, though? Why does that make a difference? Because by lowering the standard, they're basically saying that they don't need to show statewide support in order to get on the ballot. It's similar to the Illinois case. Well, they're recognizing that this is the unique national office of the presidency where national support matters in a way the Supreme Court has suggested, and they're provided an additional avenue for that very legitimate difference. Yes, but by doing so, they've never... I mean, we've never seen a case before that I've seen where relying on non-outside of the state... I mean, I guess you could, if a state passed a law saying, well, you can get 100,000 signatures from around the country, let's say, and to get on the ballot in Florida, that kind of would just not sit right. But apparently, if you can get national support, you could pass a law like that. We haven't ever seen a case where relying on national support for a Florida ballot... I mean, they're electing Florida electors here for the only national office our country has. Yes. Why doesn't that make a difference? I mean, why wouldn't it be significant that we're talking about a presidential election? Well, I mean, I believe it is significant only to the extent that just because they pass a law that allows for national support, I believe that reduces the... it undermines the stated interest to show a modicum of Florida support in order to get on the ballot and they didn't keep people off the ballot and not to do... And this law allows that to happen. Well, they're keeping our client off the ballot by enforcing... It doesn't mean that everybody gets on the ballot, but it certainly does allow more. Well, I mean, our clients, they tried to get on the ballot using a certification method in 2016 and they were denied and they believe that they should be treated as other... Counsel, why is it not a rough rubric though? You keep saying that it doesn't indicate anything about support in Florida, again, assuming that is the standard. And I think that's questionable after that statement in Anderson. But why isn't a rough rubric that you have a party that is able to jump through the hoops of going through all the SEC regulations and having a convention and doing all those things show that this is not just three guys in the basement deciding to run for president? The reason is, I mean, it's born out in the declaration of our expert, Richard Winger at document 9-1, where he goes through the history of all the parties that have applied for FEC recognition and then how much... But again, counsel, this goes to the fit. It may very well be that it's a rough rubric. In other words, sometimes it's going to be that there are independent parties not affiliated that are more popular than those that are, but why can't the state pick that as a rough rubric? And does the Anderson verdict test on a non-severe restriction require that kind of narrow tailoring that you're saying is required? No, I don't believe that it... It doesn't measure, and it comes back to this, it doesn't measure... There's no correlation to the measure of Florida support to get on the Florida ballot. And that's really where we stand in this argument. And like I said, that's where we're standing. So I know my time is up. We've gone over, and I'd like to reserve the rest for rebuttal. Oh, I'm sorry. If I'd known that, I would have cut you off earlier. I didn't hear that. Oh, no, I didn't. I think we were on a 15-minute limit, and I think I'm at 19. You have 13, so you saved two minutes for rebuttal. So let's hear from Ms. Davis. I think Ashley is a name that could be either a man or a woman. I apologize if I've guessed wrong. Your Honor, you guessed correctly. Thank you for your time today. I'd like to start with one of the pointed questions that you all have posed, and it's that in previous cases, the courts have had to expressly address which voters the modicum of support have to come from. It was pretty self-evident that the support has always needed to come from the relevant electorate. And in this one unique election, the presidential election, that electorate is outside of Florida's borders in addition to within. And that's why Florida has chosen to respect whatever that national party portion of the ballot access statute. But doesn't that hurt you with the signature one? In other words, if that's true, then why isn't the signature requirement exactly as your opposing counsel says it should be, which is 100,000 people or 1% of the United States population to show a modicum of national support? Why require 120,000, 150,000 signatures for the state of And as I understand it, every one of at least our cases that has evaluated these signature requirements has done so not in the presidential context, but has done so in the state election context. And doesn't that affect our analysis for the signature requirement? No, it doesn't. And ever since Anderson, there have been plenty of courts who have assessed the signature requirements thresholds that were or access methods that were as burdensome or more burdensome than Florida's in the context of presidential races. So even if the minor parties here are correct that the only way to account for the national interest is to lessen the showing of Florida support, they still lose because there have been plenty of cases including Anderson or after Anderson that have upheld those access requirements in presidential races that have been thresholds, petition thresholds that are as burdensome or more In our cases in the 11th Circuit? In the 11th Circuit, U.S. taxpayers was about presidential race. And Beller versus, well, U.S. taxpayers was a presidential case. Right, but that's a district court opinion that was primarily affirmed by us. And we have some pretty stringent law about what a summary affirmance means for us, unless we specifically adopt the opinion. It was specifically adopted. The 11th Circuit stated that the district court's judgment in this case was entered without error of law and was affirmed. It wasn't just as strict. Yeah, but that's not an adopt. That's not. For the reason stated by the district court, we affirm. Those are very different things. Well, circuits, other circuits in the U.S. Supreme Court have analyzed petition thresholds in the presidential context and after Anderson, when after Anderson has done it and when since Burdick. And the reason I asked about Burdick is because in Cowan, which was just a few months ago, what we said is we can't rely on older precedent and older case law that predated Burdick and Anderson because they didn't sort of, the Supreme Court hadn't quite fleshed out the and so it's incumbent upon us to do that balance. Is it not? The 9th Circuit in De La Fuente in 2019 affirmed California's 1% threshold requirement. That is the most similar to Florida's 1% requirement, but it was still more burdensome because it required 1% gathered in a 110-day window. So that's a case from the 9th Circuit from very recently in 2019. Can you answer my question about Cowan? I'm sorry, could you repeat it? Yes. In Cowan, just a few months ago, we had a Georgia signature requirement, and I believe it was the Libertarian Party was one of the appellants there, and the district court there had said, well, you know, there's all this case law, including from the Supreme Court upholding Georgia signature requirements, so we don't really need to go through Anderson-Burdick again. And what we said is no, because Anderson and Burdick sort of reshaped how we view these things. It's incumbent upon us and the district court to do a balance. It isn't incumbent upon us not just to say, well, we're bound by the cases in the Libertarian Party from 83 and some of our others that have upheld this. We have to actually go back and do the nuts and bolts of an Anderson-Burdick way. Isn't that right? Yes, absolutely. You still do. But the thing is, is that it's unaccompanied by any, if there's been no change to the thresholds or the method of access since those decisions upholding it, there's no non-frivolous argument that anything has changed for the worse, then I don't... Yeah, they still have some precedential value to the extent that facts have changed on the ground of the political landscape that are material. And yeah, that's important, but that's not to say that those earlier precedents have no value. Right? Correct. And the minor parties here haven't pointed to any difference other than the addition of another method of access to change the balance in any way. And as a matter of logic, the addition of another ballot access method can't possibly restrict access. Even if we took it away, that national affiliation method, we would still be left with the substantially similar 1% threshold that's been upheld before in more burdensome forms. But what I'm confused about is, and I want to go back to where I started with you, which is, if the law is under Anderson that the state's interest is significantly less than in presidential elections, and the 1% threshold is the same threshold that the state uses for state elections and for federal elections and the presidential election, then how is the weighing not significantly different? How do we not weigh that differently, at least for the signature requirement? I think you have a stronger argument for that reason on the national party provision. But with regard to the signature provision, how does that not tip the scale at least a little bit away from the state and more towards the challenger? I'd point to the Ninth Circuit's decision in De La Fuente. In the presidential race, they had a 1% threshold that was more burdensome than ours, and it was evaluated under Anderson-Burnett and found to be- I'm sorry. I think what Judge Luck is asking is, if you have a 1% threshold in the state presidential election and a 1% threshold, I'm sorry, in a presidential election and a 1% threshold in the state election, but your interest in the confusion of the ballot or whatever, your interest in the presidential election is lesser than your interest in the state election, then-and Judge Luck, if I'm getting you wrong, please just correct me. But my understanding of this question is, how can we take what happened in these prior state elections and apply them to the federal election? And specifically with regard to Florida, doesn't the fact that 1% is required in a state election where there's more state interest seem to suggest that less than 1% should be required in a presidential or federal election where there is less state interest? Am I getting that right, Judge Luck? Yes, that's the question. Thank you. And the two avenues are not mutually exclusive. So we're not in the situation where we just have a 1% threshold to get onto the presidential ballot. We have both avenues that are available. And so for those who don't have or wouldn't be able to meet the 1% threshold in states, that's in the national interest. Well, let me suggest this. Might it be that just because the state has less of an interest does not mean that it has no interest? And therefore, having the 1% requirement as one option, does it mean this isn't a context where the state has no interest? It does. I mean, after all, the President of the United States is the President for Florida, too. But it recognizes that it has a lesser interest when it comes to presidential elections and provides this additional method that is based on national support. What do you say to that? I agree completely with that. The state's interest isn't nothing in a national election. We still have the ability to require some showing of a modicum of support. And we've done that by providing two alternate avenues that aren't mutually exclusive. Can you address standing, and specifically with regard to the signature requirement? Yes, I can. I think it was a good point for the Court to specifically have us address standing. I'd say here the minor parties don't have standing because they only have a bare desire to get on the ballot, and they've made no attempt to comply with the methods to do so. And ever since Lujan, even that sworn desire has been insufficient to confer standing. Well, they contend that the law is unconstitutional, and they have a candidate for President. And that law is what prevents their candidate from being on the ballot, right? I mean, that law is injuring them. It takes three voters to make a minor party in Florida. That status, plus having a preferred candidate that you'd like to put on the ballot for President, that can't be sufficient enough for standing. Well, that might be why they lose on the merits, but it doesn't mean they haven't been injured by the law. And I agree. It certainly is a reason why they lose on the merits, because they can't come up with any evidence of a burden on them since they haven't tried. But I'll point out this from Bernbeck, which is the specific case you all wanted us to address. The dissent cited a string of cases to support the proposition that courts have consistently held that just that intention to gain access is sufficient for standing. But when you look closer at the cases that were cited, none of them actually stands for that proposition. And I'll give you an example of that. The dissent cited Green Party of Tennessee versus Hargett. And the dissent in parenthetical said that it held that plaintiffs had standing to pursue ballot access claims despite not complying with the signature gathering requirement. But the court in Hargett expressly recognized that, quote, the Constitution Party has tried but failed to collect the requisite number of signatures, unquote. That's at 554 of the opinion. So they did try and collect petitions. They just didn't meet the required number. But the Bernbeck case, though, the Eighth Circuit case, is really a different problem, isn't it, in considering standing? Because there a petition circulator was alleging that he was injured by a requirement, a signature distribution requirement for initiatives, because the requirement gave the signatures of voters in rural counties greater weight than other signatures. But the problem was he had never even attempted to collect or submit a single signature for a voter initiative and had no definite plans to do so in the future. So there was really no imminent risk of being unequally valued under the signature distribution requirement, which is really different from this case. I don't know that it's all that different. It's still just a bare desire to want to get onto the ballot. And I don't know that having one of the minor parties here today having two minutes remaining indicated a desire for their candidate should be enough for standing. Because the bar is so low to be a minor party in Florida, that would mean that any group of three electors who are a minor party can just state that they want a candidate on the ballot as president and suddenly have standing and an injury to be able to challenge one of the methods of access. Now... There was a number of different parties that challenged the access, the ballot access statute in that case. The Libertarian Party had collected about 8,000. The Independent Party had collected about 258. Williams, which was an individual, collected 15 signatures. Robinson, another individual, collected 1,700. And the Citizens Party in Garland did not file any signatures despite negligible and, in some cases, no signatures being filed. Are we bound by that? And does that dictate the results here? You're correct that in Berlin, the court recognized that token attempts would be sufficient. But those token attempts were, as you pointed out, the actual collection of petitions from all but one of the parties. So the court has jurisdiction to answer the question for at least most of the parties before it, that it didn't technically also procedurally kick the one party for lack of standing who didn't try. But you're saying the only difference is if the three people in the basement bothered to go upstairs to mom and got mom's signature on a ballot, that would be token. But if they didn't bother to go upstairs to get mom's signature, they wouldn't be allowed to challenge. How is that distinction sufficient and enough for injury and causation understanding? That seems to be a little illogical to me. Well, I think what you have is, in Berlin, you've said that token attempts are acceptable for standing. And those token attempts were some effort to collect... Except, I'm sorry to interrupt, counsel, but one of the parties there made no effort whatsoever. And we're talking about jurisdiction. Standing goes to just disability. If there's no standing, there's not a case or controversy that we're supposed to be deciding. So it's not an option to just allow that party to trail along if there's actually no standing. So clearly, the court found standing there. Standing is a matter of the court's jurisdiction. The court had jurisdiction to answer the question because of the standing. Yeah, we have cases, don't we, counsel, that where at least one of the parties had standing, and therefore we said we could adjudicate the case without deciding whether all the parties did. Exactly. Because it's about the court's jurisdiction. If it was only one plaintiff that hadn't made any attempt, then I'm sure that this court in Berlin would have said that there wasn't sufficient standing because there wasn't even a token attempt. Ms. Davis, do you have anything you want to say in wrapping up? I know, Your Honor. Thank you so much. Okay. We'll hear two minutes of rebuttal. All right. Thank you, Your Honor. Just regarding right back on standing, I didn't get a chance to in his dissent pointed out that the two plaintiffs in that case, neither the American Independent Party nor the Socialist Labor Party made an effort to comply with Ohio's election laws. And yet the dissent didn't squawk at the fact that there were any standing issues. And in fact, the majority opinion at page 28, after mentioning that the parties conceded that they couldn't satisfy the signature requirements, two paragraphs later said, after summarizing their arguments, said these cases do raise a justiciable controversy under the Constitution. And so standing does exist in this case because of the futility exception to the injury in fact So with that, though, I'm happy to address any other questions the court may have or rest on the briefs. Okay. I have a question for you. So getting back to Judge Locke's question to your colleague about the difference between, if there is one, 1%, the 1% requirement for state election versus the 1% requirement for a presidential election, how would you determine what the appropriate ratio should be, whether less than 1% versus 1% versus state translates to how much percent in a presidential election? Yes, I understand the question. I haven't thought about this before, this oral argument before, mainly because the Supreme Court has said that 5% is enough. But it is true that having the same requirement does weigh against the state slightly, but you know, you still have to consider the entire election organizational structure in its context. And so, you know, there is some weighing that goes against the state in that situation. But I don't know if in a particular case, especially when you're just saying, is 1% enough, and that's the only standard or the only statute that you're considering, then I'm not sure it's enough to push this, you know, say that the state didn't justify its regulation. But in this situation, we have multiple ways to get on the ballot. And I think the various ways implicate associational rights. And that's why we believe it's unconstitutional to work after they instituted the association requirements that lessened the interest in the signature requirement. And I think that's a bigger predicate to undermine the state's interest in a 1% signature requirement in this case. Okay. Council, I think we have your case. And we are adjourned for the week. All right. Thank you, Your Honor. Thank you.